# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**HERSCHEL WILSON**, et. al.,

      Plaintiffs,

      vs.                          No.  **CIV 07-683 MCA/RLP**

**DONALD O'CONNOR,** et. al.**,**

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiffs' Motion and Memorandum for Partial Summary Judgment* [Doc. 73], filed March 13, 2008; *Defendants' Motion for Summary Judgment* [Doc. 80], filed May 8, 2008; *Defendants' Motion for Partial Summary Judgment on Plaintiffs' Alleged Emotional Distress Claims* [Doc. 89], filed June 9, 2008; and *Defendants' Motion for Summary Judgment on Plaintiff Herschel Wilson's Claims* [Doc. 93], filed June 9, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies each motion.

## I. BACKGROUND

On or about March 3, 2006, the plaintiffs[1] in this case were students and basketball team members—or the parents of student/basketball team members—at the To'Hajiilee

---

[1]  The plaintiffs are Jordan Etcitty; Herschel Wilson; Clint Apachito; Hewitt Francisco; Joshua Sandoval; Rena and Earlman Ganadonegro (representing their minor son, Randall Pablo); Dolly Francisco (representing her minor son, Isaac Francisco); Tony Secatero (representing his minor son, Clifton Secatero); and Melinda Mexicano (representing her minor son, Daaron Pablo). [Doc. 49 at 2-3].

Community School, which is located outside Albuquerque, New Mexico.  On that date, the To'Hajiilee basketball team was in Des Moines, New Mexico preparing to play in a regional semi-final tournament against basketball teams from the Des Moines, Springer, and Temple Baptist high schools.  Defendants Donald O'Connor and David Romero are New Mexico State Police Officers who were at the tournament for the purpose of providing security. While at the tournament, Officers O'Connor and Romero were dressed in full uniform and their guns were visible.

Before the tournament began, Officer O'Connor was made aware that certain items had gone missing from the Temple Baptist team's locker room.  According to Officer O'Connor, he decided to search the To'Hajiilee team's locker room because (1) Temple Baptist parents were "screaming and hollering [that] '[s]omething ha[d] to be done[;]'" (2) one of the principals told Officer O'Connor that items had been taken from the Temple Baptist locker room; (3) the Temple Baptist and To'Hajiilee locker rooms were in close proximity to each other; and (4) only the Temple Baptist and To'Hajiilee teams had access to the area in which the Temple Baptist locker room was located. [Doc. 90; Exh. A, Feb. 9, 2008 O'Connor depo. at 6-7].  Both Officers O'Connor and Romero concede that they did not have probable cause to believe that any of the To'Hajiilee team members had taken the allegedly stolen items. [Doc. 73 at 3; Doc. 75 at 7].

At some point, Officer O'Connor also decided to search the To'Hajiilee team members. Through his deposition, Officer O'Connor testified that on March 3, 2006, he believed that in order to search those players, he "needed consent from the players and their

legal guardian at the time.  To [his] understanding, that would have been the coach or the school representative." [Doc. 73; Exh. 2, Feb. 9, 2008 O'Connor depo. at 27-28].  Officer O'Connor now believes that he "need[s] consent from the players, the coach, and the parents if they're available." [Id.; Exh. 2, O'Connor depo. at 28].  Consistent with his understanding at the time, Officer O'Connor testified that he then asked To'Hajiilee Coach Frank Larrabee and To'Hajiilee school representative Kim Platero "if they would consent to a search to rule their team out as suspects in the incident."  [Id.; Exh. 2, O'Connor depo. at 26-27].  He did not ask any To'Hajiilee parents in attendance for their consent to search their children. Through his deposition, Frank Larrabee testified that he did not recall being advised that the purpose of the search was to rule out his players as suspects; instead, he testified that he gave permission for the  search after asking, "We're not going to get out and play unless we say yes, right?" and being told, "[T]hat's right." [Doc. 95; Exh. 1, Apr. 30, 2008 Larrabee depo. at 100].

Officer O'Connor believes that Coach Larrabee then told his players, "The officers want to search your stuff.  Let's just do this so we can get the game started." [Doc. 75; Exh. B, O'Connor depo. at 30].  Frank Larrabee confirmed that he told his players, "Fellas, we're not getting out there unless we do this, you know.  It's what we have to do." [Doc. 84; Exh. 2, Larrabee depo. at 101].  At that point, a few of the To'Hajiilee players, who had been warming up, threw their gym bags out into the center of the gym floor, but Officer O'Connor asked them to pick them up and bring them into the locker room.  Officers O'Connor and Romero, Coach Larrabee, Assistant Coach Kelly Werito, and the To'Hajiilee players then

went into the team locker room.  [Id.; Exh. B, O'Connor depo. at 30-31].

Once in the locker room, Officer O'Connor asked the team—as a whole—for consent to search their bags. [See Doc. 75; Exh. C, Feb. 9, 2008 Romero depo. at 41].  It is undisputed that Officer O'Connor did not specifically request permission to search from any individual player. [Doc. 73 at 4; Doc. 75 at 8].  According to Officer O'Connor, when he told the students that he was trying to rule them out as suspects, "three or four" of the players responded, "We want to get this done." [Doc. 73; Exh. 2, O'Connor depo. at 31-32].  For his part, Officer Romero "remember[ed] one kid grumbling, 'Let's just do this.'" [Id.; Exh. 1, Romero depo. at 41].

Officer O'Connor did not inquire further of the players who did not respond to him. Instead, because "[e]verybody was lining up to—to have their—to show [him] their items, [he] felt that they were giving [him] consent by their actions." [Doc. 73; Exh. 2, O'Connor depo. at 32].  In other words, Officer O'Connor assumed that the players were consenting to his search. [Id.; Exh. 2, O'Connor depo. at 32].  Officer O'Connor then "had each player come up, open their bags, pull their items out if they had a bag, and looked through the items, placed their items back in their bag, and sent them around the corner."  [Id.; Exh. 2, O'Connor depo. at 32].  He did not present the players, Coach Larrabee, or anyone else with the "generic consent form" he believed he "possibly" had in his car.  [Id.; Exh. 2, O'Connor depo. at 74].

Some of the To'Hajiilee players also testified as to their recollection of the search. Jordan Etcitty testified as follows:

Q:    What did they tell you that Temple Baptist said?

A:    I don't know. The police officer said that Temple Baptist was missing a couple of their belongings.

Q:    And what else did he say?

A:    That we have to get searched in order for us to play again.

Q:    And what did you do?

A:    Let them search me.

Q:    Did you try to leave at any point?

A:    He told us we couldn't.

Q:    Who told you you couldn't?

A:    One of the cops.

Q:    What did they say?

A:    They said, "Stay here until the rest of you guys have been searched."

[Doc. 73; Exh. 3, Dec. 18, 2007 Etcitty depo. at 53]. Hewitt Francisco testified that he was warming up on the court when the officers "told [the players] to go to the locker room so they [could] search [them]. . . ." [Id.; Exh. 4, Jan. 3, 2008 H. Francisco depo. at 37]. He also explained that the officers "told [the players] to open [their] bags and line up to be searched; stand in line by [their] bags, because they were going to search them." [Id.; Exh. 4, H. Francisco depo. at 38]. According to Isaac Francisco, the players were not allowed to leave the locker room. Instead, "[the officers] just told [the players] to get in there and stay in there until they're finished—were done searching." [Doc. 95; Exh. 4; Jan. 3, 2008 I. Francisco depo. at 71].

Assistant Coach Kelly Werito similarly testified that he was not asked for permission but, rather, told that everybody with a bag was going to have the bag searched. At his deposition, the following colloquy took place:

5

> Q:      Do you ever recall the police asking to search your bag?
> A:      Never asking, no.
> Q:      Do you recall the police telling you you had to have your
>          bag searched?
> A:      Yes. . . .

[Doc. 73; Exh. 6, Jan. 4, 2008 Werito depo. at 36]. In contrast to the testimony of Jordan

Etcitty and Isaac Francisco that the players were not allowed to leave the locker room until

everyone had been searched, Officer Romero testified that, while none of the players "made

an attempt" to return to the gym, he and Officer O'Connor "would not have kept them if they

chose to." [Doc. 75; Exh. C, Romero depo. at 41]. The property in question was not

recovered as a result of the search of the locker room, the To'Hajiilee players' bags, or a

subsequent search of the team bus.

    After the search of the bags, the To'Hajiilee players returned to the gym and played

their game. Distracted from and bothered and confused by the search, the To'Hajiilee

players lost.[2] For the seniors on the team, this was the last game of their high school career.

_____

[2] [See Doc. 95; Exh. 5, Werito depo. at 41:

> Q:      How did your team play that night?
> A:      Horrible, like they were distracted or something. None of them were
>          focused. They started the game off confused, embarrassed about going
>          back onto the court. They looked that way to me.
> Q:      Why did it look that way to you?
> A:      Just the expressions on their faces and the way they played the game. You
>          could tell something was bothering them. They weren't playing to their
>          potential.
> Q:      Do you recall what the score was?
> A:      No, I do not.
> Q:      Did you guys lose?
> A:      Yes.
> Q:      Did you lose by a lot?
> A:      Yes.

On December 4, 2007, Plaintiffs filed their *Third Amended Complaint for Damages to Remedy Civil Rights Violations and Common Law Torts* pursuant to 42 U.S.C. § 1983 and the New Mexico Tort Claims Act.  In their *Complaint*, Plaintiffs allege that Defendants O'Connor and Romero violated their Fourth Amendment right to be free from an unreasonable seizure (Count I); violated their Fourth Amendment right to be free from unreasonable searches (Count II), and committed the torts of false arrest and false imprisonment by detaining them (Count III) [See generally Doc. 49].  Plaintiffs now move for summary judgment on Count II, and Defendants have filed three separate motions for summary judgment—*Defendants' Motion for Summary Judgment* [Doc. 80]; *Defendants' Motion for Partial Summary Judgment on Plaintiffs' Alleged Emotional Distress Damages* [Doc. 89]; and *Defendants' Motion for Summary Judgment on Plaintiff Herschel Wilson's Claims* [Doc. 93].

## II. ANALYSIS

### A. Summary Judgment

The Court may enter summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir.1995) (quoting Fed.R.Civ.P. 56(c)).  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving

party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).

An issue of fact is "material" if under the substantive law it is essential to the proper

disposition of the claim.  See id. at 248.

When, as here, the movant is also the party bearing the burden of persuasion with

regard to the claim on which a summary judgment is sought, the movant must show that the

record as a whole satisfies each essential element of its case and negates any affirmative

defenses in such a way that no rational trier of fact could find for the non-moving party.  See

19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir.

1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri

Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D.Kan. 1993).  The admissions

in a party's answer to a complaint are binding for purposes of determining whether the

movant has made such a showing.  See Missouri Housing Dev. Comm'n v. Brice, 919 F.2d

1306, 1314-15 (8th Cir. 1990).  Similarly, the Court may consider any undisputed material

facts set forth in the motion papers which are deemed admitted by operation of D.N.M. LR-

Civ.56.1.  See LaMure v. Mut. Life Ins. Co. of N.Y., 106 F.3d 413, 1997 WL 10961, at *1

(10th Cir. 1997) (unpublished disposition); Smith v. E.N.M. Med. Ctr., 72 F.3d 138, 1995

WL 749712, at *4 (10th Cir. 1995) (unpublished disposition); Waldridge v. American

Hoechst Corp., 24 F.3d 918, 920-24 (7th Cir.1994) (approving use of local rule similar to

D.N.M. LR-Civ. 56.1(b)).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess

the credibility of witnesses, or make factual findings in ruling on a motion for summary

judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish, first, that the defendant violated a constitutional right.  Cortez v. McCauley, 438 F.3d 980, 988 (10th Cir. 2006) (citing Reynolds v. Powell, 370 F.3d 1028, 1030 (10th Cir.2004)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, however, a violation has been shown, the next step in the qualified-immunity sequence is to ask whether the constitutional right was clearly established when the alleged conduct occurred.  See Cortez, 438 F.3d at 988.

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Saucier, 533 U.S. at 202.  For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains.  Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002).  Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct was clearly unlawful.  Saucier, 533 U.S. at 202.  If, however, the plaintiff successfully establishes both a violation of a

9

constitutional right and that the right was clearly established at the time of the alleged conduct, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law.  Cortez, 438 F.3d at 988 (*citing* Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir.2002)).  "In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense." Olsen, 312 F.3d at 1312.

### B. *Plaintiffs' Motion and Memorandum for Partial Summary Judgment* [Doc. 73] and *Defendants' Motion for Summary Judgment* [Doc. 80]

Plaintiffs bring Counts I and II of their *Complaint* pursuant to 42 U.S.C. § 1983, arguing that Officers O'Connor and Romero deprived them of their Fourth Amendment rights to be free from unreasonable searches and seizures. [Doc. 49 at 7].  Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere, see Albright v. Oliver, 510 U.S. 269, 271 (1994), and provides a remedy "for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color

10

of law." Curley v. Klem, 298 F.3d 271, 277 (3rd Cir. 2002).  Accordingly, an analysis of a plaintiff's federal civil-rights claim necessarily begins by identifying the specific constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

In this case, Plaintiffs argue that Officers O'Connor and Romero failed to secure specific, knowing, and voluntary consent before conducting their warrantless search of Plaintiffs' bags, in violation of the Fourth Amendment. [Doc. 84 at 5-7].  Moreover, because Plaintiffs do not believe that Officers O'Connor and Romero can demonstrate that any consent they may have received was valid, Plaintiff seek partial summary judgment with respect to Count II (unreasonable search).  Officers O'Connor and Romero have moved for summary judgment on the ground that they are entitled to qualified immunity because they did not violate clearly established law in conducting the searches. [Doc. 80; Doc. 81 at 7 ("Even if Plaintiffs did not voluntarily submit to the search of their bags, which is specifically denied, Defendants are entitled to the protections of the doctrine of qualified immunity.")].

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A warrantless search "'is unreasonable *per se* under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent.'"  Eidson v. Owens, 515 F.3d 1139, 1145-46 (10th Cir. 2008) (*quoting* United States v. Glover, 104 F.3d 1570, 1583 (10th Cir.1997)).  Conversely, "[i]t

is well established that a search conducted pursuant to a valid consent is constitutionally permissible." Dubbs v. Head Start, Inc., 336 F.3d 1194, 1207 (10th Cir. 2003) (*citing* Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)).

Consent is valid if it is given voluntarily. Whether consent is in fact voluntary or, instead, "was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality-of-the-circumstances." Glover, 104 F.3d at 1583. Factors to consider in assessing the voluntariness of a consent to search include: physical mistreatment; use of violence or threats of violence; promises or inducements; deception or trickery; and the physical and mental condition and capacity of the individual alleged to have given consent. Id. at 1584. The age of the allegedly consenting party may be taken into account, as may the circumstances of the situation in which consent is alleged to have been given. See Schneckloth, 412 U.S. at 226. In short, the two-part test a defendant must satisfy to demonstrate valid consent involves a showing of (1) clear and positive testimony that consent was unequivocal and specific, and freely and intelligently given; and (2) proof that this consent was given without implied or express duress or coercion. United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003).

Consent need not be express or verbal. Instead, an individual may give valid consent through gestures or other nonverbal conduct. See United States v. Benitez, 899 F.2d 995, 998 (10th Cir. 1990) (valid and voluntary consent to search vehicle given when, in response to Border Patrol agent's request to search, driver exited vehicle, opened trunk, and opened suitcase contained in trunk). Shoulder shrugs, for example, may suffice as one form of

nonverbal consent.  See United States v. Wilson, 895 F.2d 168, 172 (4th Cir. 1990) (defendant consented to requested pat-down search by shrugging shoulders and raising arms). Even where an individual initially verbally refuses to grant consent, subsequent or contemporaneous actions may be sufficient to support the determination that valid consent was ultimately given.  See United States v. Nelson, 489 F.Supp.2d 309, 313 (S.D.N.Y. 2007) (nonverbal actions expressed defendant's consent to DEA agents' entry into her apartment where, in response to agents' request for identification, defendant allowed agents to follow her significant distance into apartment, without objection, and "drew" door without locking it); United States v. Guerrero, 379 F.Supp.2d 1138, 1147 (D.Kan. 2005) (valid consent to search vehicle provided by defendant who, when asked second time for permission, "said nothing, but opened his hands in a manner which a reasonable officer would have construed as consent to search").

In the particular context of school searches, it is well-established that "children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate[.]'" Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 655-656 (1995) (quoting Tinker v. Des Moines Ind. Comm. School Dist., 393 U.S. 503, 506 (1969)).  Still, a relaxed Fourth Amendment standard may be appropriate in certain situations as courts endeavor to "accommodate both the interests protected by the Constitution and the interests in providing a safe environment conducive to education in the public schools." Edwards for and in Behalf of Edwards v. Rees, 883 F.2d 882, 884 (10th Cir. 1989).  Accordingly, the United States Supreme Court has held that a search of a student by a teacher or other school official need not be based

upon probable cause but, rather, "should depend simply on the reasonableness, under all the circumstances, of the search." New Jersey v. T.L.O., 469 U.S. 325, 341 (1985). T.L.O., however, "d[id] not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and [the Court] express[ed] no opinion on that question." Id. n.7. Subsequent cases, however, have established that while the reasonable-under-the-circumstances standard applies where, for example, (1) a school official initiates a search and works in conjunction with, but not at the behest of, the police, see Cason v. Cook, 810 F.2d 188, 191-192 (8th Cir. 1987), or (2) a school official requests a police officer assigned as a resource officer to a public high school to conduct a student search during school hours, see In re Josue T., 128 N.M. 56, 62 (N.M. App.), cert. denied, 128 N.M. 149 (1999), probable cause remains the standard where a search is "not conducted by school authorities on their own initiative or even by school authorities with or at the direction of a law enforcement agency [but, rather, is] conducted completely at the discretion of the police officers." State v. Tywayne H., 123 N.M. 42, 45 (N.M.App. 1997).  Thus, probable cause—not reasonableness—was the standard by which the search of a student by two uniformed police officers providing security at a high school dance should have been measured in Tywayne H. Id.

In the instant case, the Court concludes that the constitutional right asserted by Plaintiffs, *i.e.*, the Fourth Amendment right of students to be free from warrantless searches conducted at the complete discretion of police officers, was clearly established on March 3,

2006.  However, given the highly contested issue of whether Plaintiffs *validly consented* to the search, the Court also concludes that this situation presents one of those "exceptional circumstances [where] historical facts [are] so intertwined with the law that a jury question is appropriate as to whether a reasonable person in the defendant[s'] position would have known that [their] conduct violated" the right in question.  Maestas v. Lujan, 351 F.3d 1001, 1007 (10th Cir. 2003).  In Maestas, the Tenth Circuit affirmed the district court's decision to submit to the jury the "hotly contested" issue of whether a reasonable person in the defendant's position would have known that his conduct violated the plaintiff's clearly established right to be free from workplace sexual harassment where the parties "presented diametrically opposed versions of their relationship," with defendant insisting that he and plaintiff had engaged in a consensual romantic/sexual relationship and plaintiff insisting that defendant was nothing more to her than a workplace supervisor.  Id. at 1009.  Indeed, where "the legal question of qualified immunity turns upon which version of facts one accepts, the jury, not the judge, must determine liability."  Fisher v. City of Memphis, 234 F.3d 312, 317 (6th Cir. 2000) (internal quotation omitted) (question of whether police officer's use of deadly force was objectively reasonable was properly submitted to jury).

As in Maestas and Fisher, the qualified immunity analysis in this case hinges upon whose version of the facts (relating to the granting of consent) is believed.  According to Officer O'Connor because "[e]verybody was lining up to—to have their—to show [him] their items, [he] felt that they were giving [him] consent by their actions." [Doc. 73; Exh. 2, O'Connor depo. at 32].  In other words, Officer O'Connor believed that the To'Hajiilee

players were giving implied consent to search their bags through their unspoken gestures and actions.   Officers O'Connor and Romero both testified that they remembered students making comments such as, "We want to get this done" and "Let's just do this."  [Doc. 73; Exh. 2, O'Connor depo. at 31-32; Exh. 1, Romero depo. at 41]. Officer Romero additionally testified that, while none of the players "made an attempt" to return to the gym, he and Officer O'Connor "would not have kept them if they chose to." [Doc. 75; Exh. C, Romero depo. at 41].  The officers have presented one version.

By contrast, the players have testified that they were not asked for permission but, instead, told that they were going to be searched and, further, that the entire team was required to remain in the locker room until all team members had been searched.  Frank Larrabee testified that he told his players, "Fellas, we're not getting out there unless we do this, you know.  It's what we have to do[,]" after confirming that the team would not be allowed to play unless the players permitted a search of their bags.   [Doc. 84; Exh. 2, Larrabee depo. at 101; Doc. 95; Exh. 1, Apr. 30, 2008 Larrabee depo. at 100].  Although some To'Hajiilee parents were in attendance, they were not asked for permission to search their children.

Finally, the voluntariness (and thus the validity) of the To'Hajiilee players' consent must be considered and evaluated in the particular circumstance of high school boys away from home (some separated from their parents) to play in an important basketball tournament that, at least for the team's seniors, would be one of the final games—if not *the* final game—of their high school careers.  While warming up, the boys were confronted by two

16

fully uniformed (with guns visible) police officers who, if the players' version is credited, told them that their gym bags were going to be searched because they were suspects in the theft of another team's property.  Thus under one version of events, consent was given voluntarily, but under the competing version of events, any consent provided could certainly be seen to have been the product of duress or coercion.[3]  Accordingly, the scenario that presents itself here raises a jury question inasmuch as there remain contested issues of fact that are material to the qualified immunity analysis.  See Maestas, 351 F.3d at 1008.  For this reason, *Defendants' Motion for Summary Judgment* will be denied.  Additionally, because *Plaintiffs' Motion and Memorandum for Partial Summary Judgment* presents the flip side of Defendants' summary-judgment motion (as Plaintiffs contend that "the undisputed material facts show that Defendants neither requested nor received consent from any of the Plaintiffs [and therefore] Defendants cannot possibly meet their burden of showing valid consent"), Plaintiffs' motion will also be denied at this time.

### C. *Defendants' Motion for Partial Summary Judgment on Plaintiffs' Alleged Emotional Distress Damages* [Doc. 89]

Officers O'Connor and Romero next move for summary judgment with respect to any emotional-distress damages that Plaintiffs seek to recover, arguing that Plaintiffs cannot prove either that they suffered any emotional distress or that their alleged emotional distress was caused by the officers' actions, particularly where they have not sought treatment for this

---

[3]  Additionally, although there has been no allegation of physical mistreatment or the use or threat of the use of violence, it is undisputed that the officers' guns were visible to the boys.  Also, material factual issues exist as to whether the officers made the search a prerequisite to To'Hajiilee's participation in the tournament.  See Glover, 104 F.3d at 1583.

alleged distress from any health care provider. [See Doc. 90 at 6-7].[4]

In the Tenth Circuit, "'damages may be awarded for nonpecuniary injury, such as psychological harm, where [the] plaintiff has been deprived of his substantive constitutional rights.'" Miller v. Glanz, 948 F.2d 1562, 1568 (10th Cir. 1991) (quoting Foster v. MCI Telecommunications Corp., 773 F.2d 1116, 1120 (10th Cir.1985)).  A plaintiff need not present testimony from a treating physician or psychologist to maintain a claim for such damages, because while "[s]uch testimony is one suggested method of proving emotional damages [it] is not the sole dispositive requirement." Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1417 (10th Cir. 1997); see also Bailey v. Runyon, 220 F.3d 879, 880-881 (8th Cir. 2000) (explaining—and quoting and citing other cases setting forth the same proposition—that medical or other expert evidence is not required to prove emotional distress, and that a plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden, assuming the plaintiff can convince the trier of fact that the violation caused his distress).

---

[4] The bulk of *Defendants' Motion for Partial Summary Judgment on Plaintiffs' Alleged Emotional Distress Damages* actually is devoted to setting forth the reasons Plaintiffs cannot recover for the tort of intentional infliction of emotional distress. [See Doc. 90 at 7-9].  However, Plaintiffs did not assert such a state-law claim in the *Third Amended Complaint*, a point they reaffirm in their response to Defendants' motion. [See Doc. 95 at 1-2 ("Defendants' motion also raises a straw man by addressing an intentional infliction of emotional distress claim that they argue plaintiffs may have raised in the Third Amended Complaint. The Third Amended Complaint does not admit of such a claim under any reading. Defendants' motion as to this point should be denied as moot.").  Through their reply, Defendants appear to withdraw their intentional-infliction-of-emotional-distress argument. [See Doc. 100 ("Plaintiffs[] indicate that they are not making a claim for intentional infliction of emotional distress.  On Plaintiffs' indication, Defendants will withdraw this fact.").

In this case, the To'Hajiilee players testified that, as a result of the March 3, 2006 search, they felt "[h]umiliated, embarrassed, stressed out." [Doc. 95; Exh. 2, March 24, 2008 Apachito depo. at 11]. Team member Clint Apachito testified that he "really felt bad . . . like [he] let the community down." [Id.]. Isaac Francisco similarly testified to feeling angry, humiliated, and upset as a result of the search, and he believed from what he observed of teammates that they felt the same. [Id.; Exh. 4, Jan. 3, 2008 I. Francisco depo. at 64-66]. Daaron Pablo has explained that the search caused him to feel humiliated, embarrassed, and "[l]ike a criminal." [Id.; Exh. 6, Jan. 3, 2008 Pablo depo. at 43]. Finally, Assistant Coach Kelly Werito confirmed the embarrassment his players felt as a result of the search, adding that the seniors, for whom this "really big game" marked the end of their high school basketball careers, "were the ones taking it the hardest." [Id.; Exh. 5, Jan. 4, 2008 Werito depo. at 44].

In light of their deposition testimony, the Court concludes that Plaintiffs have presented sufficient evidence of emotional distress to withstand Defendants' motion for summary judgment on that claim. As Plaintiffs "freely admit," [see Doc. 95 at 10 n.3], Officers O'Connor and Romero may use the fact that Plaintiffs did not seek medical or psychological treatment for their emotional distress for such purposes as disproving causation or limiting Plaintiffs' money damages. Defendants' motion is therefore denied.

**D.** ***Defendants' Motion for Summary Judgment on Plaintiff Herschel Wilson's Claims* [Doc. 93]**

In their final motion, Officers O'Connor and Romero seek summary judgment in their favor with respect to the claims of Plaintiff Herschel Wilson ("Herschel"), arguing that Herschel lacks standing to challenge the search of the players' bags because he did not have his own bag but, instead, had placed is possessions in a teammate's bag. [See generally Doc. 93; Doc. 92 at 3].

In determining whether an individual has standing to challenge a search as violative of the Fourth Amendment, courts ask whether (1) the individual has manifested a subjective expectation of privacy in the area searched, and (2) society is prepared to recognize that expectation as reasonable.  United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995).  With respect to the second element (reasonableness), "[c]ommon experience of life . . . surely teaches all of us that the law's "enclosed spaces" mankind's valises, suitcases, footlockers, strong boxes, etc. are frequently the objects of his highest privacy expectations. . . ."  United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978).  Moreover, an individual has a reasonable expectation of privacy in—and thus standing to attack the search of—another person's suitcase or bag if the individual has entrusted his belongings to that person for storage in the suitcase or bag.  See United States v. Wilson, 536 F.2d 883, 885 (9th Cir. 1976).

In this case, Herschel manifested a subjective expectation in his friend's bag by apparently remaining with his friend and the bag as the search proceeded. Even though

Herschel was without a bag of his own, he nevertheless waited in line for the search.  Cf. United States v. Denny, 441 F.3d 1220, 1227 (10th Cir. 2006) (determining that defendant had disclaimed ownership of and abandoned searched bag, and explaining that "disclaiming ownership is tantamount to declaring indifference, and thus negates the existence of any privacy concern in a container's contents").  Furthermore, the contents of the bag were not exposed; rather, Herschel testified through his deposition that he and his friend were made to unzip and open the bag to facilitate the search.  That the bag was closed before it was searched indicates the boys' subjective expectation of privacy in it.  See United States v. Edwards, 242 F.3d 928, 936-937 (10th Cir. 2001) (defendant clearly manifested subjective expectation of privacy in the closed bags stored in trunk of car).  On the basis of the foregoing, the Court concludes that Herschel Wilson, even though he was not the owner of the bag in which he had "put [his] stuff[,]" nonetheless manifested a subjective and reasonable expectation of privacy in the bag.  Herschel Wilson therefore has standing to challenge the search of the bag containing his possessions.  Defendants' motion for summary judgment with respect to the claims of Herschel Wilson will be denied.

## III. CONCLUSION

For the foregoing reasons, each motion presented for review is denied at this time. All counts and all claims remain viable.

**IT IS, THEREFORE, ORDERED** that *Plaintiffs' Motion and Memorandum for Partial Summary Judgment* [Doc. 73] is **DENIED;**

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment*

[Doc. 80] is **DENIED**;

**IT IS FURTHER ORDERED** that *Defendants' Motion for Partial Summary Judgment on Plaintiffs' Alleged Emotional Distress Claims* [Doc. 89] is **DENIED**;

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment on Plaintiff Herschel Wilson's Claims* [Doc. 93] is **DENIED**;

**IT IS FURTHER ORDERED** that all counts and all claims remain viable at this time.

**SO ORDERED** this 29th day of September, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge